JUSTICE LaVECCHIA delivered the opinion of the Court.
**230 This appeal arises from a discovery dispute in a medical malpractice action involving a hospital's and its staff's care of a patient. The parties clash over the boundaries of privileged material under the Patient Safety Act (PSA), N.J.S.A. 26:2H-12.23 to -12.25c, and plaintiff's ability to receive responsive discovery in order to prepare her action.
In enacting the PSA, the Legislature sought to reduce medical errors by promoting internal self-reporting and evaluation by health care facilities. The Legislature protected and encouraged this new system of self-critical analysis through a statutory privilege, designed to shore up the trust expected and needed from health care facilities for the success of its facility-initiated program. At the same time, the Legislature expressly left untouched a plaintiff's ability to secure discovery of underlying information available through other means.
In this matter, the trial court endeavored to balance the interests of the parties using the framework of the PSA and ordered the release of a redacted document *422 prepared internally by hospital personnel during the process of self-critical analysis. On appeal, defendants claimed that the trial court impermissibly involved itself in a PSA regulatory function and, further, that release of the redacted document would result in a breach of the statutory privilege. The Appellate Division reversed the trial court's order of release. We now affirm in part and reverse in part the Appellate Division judgment, and we remand for proceedings in accordance with this opinion.
We affirm the panel's order shielding the redacted document from discovery because the PSA's self-critical-analysis privilege prevents its disclosure. We also affirm the panel's determination that, when reviewing a discovery dispute such as this, a trial court **231 should not be determining whether a reportable event under the PSA has occurred.
However, importantly, we reverse the judgment to the extent it ends defendants' discovery obligation with respect to this dispute. We find that defendants have an unmet discovery duty under Rule 4:17-4(d) that must be addressed. Accordingly, we provide direction on how the court should have addressed, through our current discovery rules, the proper balancing of interests between the requesting party and the responding party here, and we remand to the trial court for entry of an order consistent with the guidance set forth in this opinion and for such further proceedings as are necessary.
I.
Because this matter involves a confidential record and comes before us on interlocutory appeal from the trial court's disposition of the discovery dispute, we present only a brief recitation of the facts and procedural history.
A.
On January 12, 2013, plaintiff Janell Brugaletta[1] went to the emergency room of defendant Chilton Memorial Hospital (CMH) complaining of a week-long fever accompanied by abdominal and body pains. She was examined by defendant Calixto Garcia, D.O., diagnosed with pneumonia, and admitted to the hospital. A Computed Tomography (CT) scan revealed a pelvic abscess due to a perforated appendix. Plaintiff's doctors drained the abscess and plaintiff's fever abated. Although the abdominal pain lessened, plaintiff experienced worsening pain in her legs.
**232 Additional CT scans led CMH doctors to determine that plaintiff appeared to be developing a necrotizing fasciitis[2] in her thigh muscles and right buttock due to the abscess drainage leaking around a nerve. Plaintiff obtained a second opinion, and, thereafter, an orthopedic surgeon performed a fasciotomy and debridement. After those procedures, plaintiff was placed in the intensive care unit. Plaintiff then underwent further surgical interventions, including additional procedures to debride the fasciitis and close the wound left by the abscess, as well as an appendectomy.
*423 On January 30, 2013, during the period in which plaintiff was undergoing repeated procedures, plaintiff's doctor recorded that plaintiff missed doses of an antibiotic that the doctor had ordered. Plaintiff does not appear to have been informed of that fact prior to the filing of the Appellate Division's published opinion in this matter, although it is in plaintiff's medical record turned over in discovery.
By the time of her February 13, 2013 discharge -- three weeks after appearing in the CMH emergency room -- plaintiff's abscess drains were removed and the abdominal pain was resolved. Nevertheless, plaintiff reports having left the hospital experiencing residual pain and permanent injuries to her legs and buttock.
On January 13, 2015, plaintiff filed a complaint naming Dr. Garcia and CMH as defendants, alleging deviations from standards of medical care in their diagnosis, care, and treatment of her. About a year later, plaintiff filed an amended complaint to add claims against Steven D. Richman, M.D., Patrick J. Hines, M.D., and Montclair Radiology, alleging that Doctors Richman and Hines, who performed her CT scans and CT-guided drainage, negligently failed to detect a second abscess.
**233 During pre-trial discovery, plaintiff served a set of interrogatories on defendant CMH on March 5, 2015. The fifth interrogatory requested the following:
State:
(a) the name and address of any person who has made a statement regarding this lawsuit;
(b) whether the statement was oral or in writing;
(c) the date the statement was made;
(d) the name and address of the person to whom the statement was made;
(e) the name and address of each person present when the statement was made; and
(f) the name and address of each person who has knowledge of the statement.
Unless subject to a claim of privilege, which must be specified:
(a) attach a copy of the statement, if it is in writing;
(b) if the statement was oral, state whether a recording was made and, if so, set forth the nature of the recording and the name and address of the person who has custody of it; and
(c) if the statement was oral and no recording was made, provide a detailed summary of its contents.
On June 1, 2015, defendant CMH responded:
Upon the advice of counsel, objection to the form of the question. This request is overly broad, burdensome and intended to harass this defendant and seeks information that is not reasonably calculated to lead to the discovery of admissible evidence pursuant to R. 4:10-2 and is otherwise irrelevant under N.J.R.E. 401. Further, this request seeks information that is protected by the work-product doctrine, the peer review privilege, the privilege of self-critical analysis, the attorney client privilege and is otherwise evidence of subsequent remedial measures under N.J.R.E. 407. Without waiving said objections, to be provided.
Following plaintiff's request for a more specific answer to interrogatory number five, CMH served plaintiff with further detail regarding the claimed privilege. The expanded answer repeated the above response verbatim until the final sentence, upon which it elaborated as follows:
*424 Without waiving said objections, and without limitation, there are 2 Reports regarding this matter. The reports are not included herein based upon the above objections. Additionally, the information contained in said reports is protected by the privilege of self-critical analysis and the Peer [R]eview and Improvement Act of 1982[,] 42 U.S.C. § 1320c-3 et seq., the Health Care Quality Improvement Act[,] 42 U.S.C. § 11101, et seq. N.J.S.A. 2A:84A-22.8, [the PSA,] and Hospital Policy. The documents and the information contained therein are strictly confidential and may **234 not be disclosed or distributed to any person or entity outside the peer review or utilization review process, except as otherwise provided by law.
Enclosed is a Privilege Log of Incident Reports. Please note, there exists a letter dated February 20, 2013 from Charlene McCallum, Patient Representative, to [plaintiff], bates stamped Confidential -- Incident Report 005, which is being disclosed.[3 ] However, the 2 Incident Reports referenced above, are not being produced based on the aforementioned objections.
On September 22, 2015, plaintiff made a motion to compel discovery of the identities of the CMH committee or committees that reviewed plaintiff's case; submission of the related unredacted reports for in camera review; and, ultimately, disclosure of redacted versions to plaintiff. CMH filed a cross-motion for a protective order. Accompanying CMH's motion was the certification of Ebube Bakosi, M.D., stating that two incident reports prepared "for the sole purpose of complying with the requirements of the PSA" were generated regarding plaintiff and that those reports were forwarded to the Patient Safety Committee but no other committees.
The trial court heard argument on the motions and conducted an in camera review of the incident reports during which the court heard ex parte argument from defendants' counsel. During the ex parte argument, the court marked the reports for identification as DCP-1 and DCP-2, respectively.[4]
On March 29, 2016, the trial court filed a written opinion ordering the release of a redacted version of DCP-2. The court found that the report was the product of a self-critical analysis conducted pursuant to the PSA and reviewed its content. The court found, contrary to CMH's determination, that the report revealed plaintiff had suffered a Serious Preventable Adverse Event (SPAE) under the PSA.[5] The court then considered two **235 interrelated issues: (1) "when a hospital erroneously fails to report a [SPAE], what[,] if anything, should be the remedy?"; and (2) "what standard [of review] should be applied?" The court first rejected as "unjust and incorrect" a reading of the statute that would "automatically negate the entire privilege whenever a failure to report occurs" after considering "instances where a hospital's Patient Safety Committee [formed and operating pursuant to the PSA and its implementing regulations] *425 makes a good faith finding that there was not a [SPAE], only to have a [c]ourt disagree." The court noted that "[s]uch an outcome would not comport with the inherent discretion that Patient Safety Committees have in determining whether a [SPAE] occurred."
Instead, to respect the inherent discretion vested in Patient Safety Committees for making SPAE determinations, as well as the policy goals of the PSA, the court determined that
[i]f a reviewing [c]ourt concludes that a [SPAE] occurred and was not reported, the Hospital must be ordered to report the event to the Patient and to the New Jersey Department of Health [ (DOH) ] as mandated by the [PSA]; [and] [i]f the [c]ourt further concludes that the Hospital's decision not to report was "arbitrary and capricious," the hospital loses its privileges under the [PSA].
Although the court found a "clear error in judgment" in CMH's finding that no SPAE occurred here, it determined that the error did not rise to the level of being an arbitrary and capricious act. Thus, although the court ordered the release of DCP-2, the court prepared a redacted version of the document in an attempt to honor the self-critical-analysis privilege while revealing the facts of the SPAE to plaintiff. Further, the court ordered CMH to report the SPAE to the DOH.
The court stayed its order to permit defendants to file for leave to appeal.
**236 B.
The Appellate Division granted plaintiff leave to appeal and reversed the trial court's order. Brugaletta v. Garcia, 448 N.J. Super. 404, 408, 419, 153 A.3d 959 (App. Div. 2017). Framing the issue as a review of a discovery disposition, id. at 411, 153 A.3d 959, the appellate panel first determined that the only precondition to the applicability of the PSA's self-critical-analysis privilege is whether the hospital performed the self-critical analysis in compliance with N.J.S.A. 26:2H-12.25(b) and its implementing regulations, id. at 414-15, 153 A.3d 959. According to the panel, the plain language of N.J.S.A. 26:2H-12.25(g), which establishes the self-critical-analysis privilege, does not condition the privilege on a SPAE finding or compliance with the PSA's reporting requirements. Id. at 416-17, 153 A.3d 959.
The panel also reviewed the trial court's decision to order that CMH report the SPAE to plaintiff and the DOH. Id. at 417-19, 153 A.3d 959. In so doing, the panel considered whether the trial court properly found that a SPAE had occurred, and it determined that the trial court's SPAE determination was in error. Id. at 418-19, 153 A.3d 959. In order to determine whether the record contained sufficient evidence to support the trial court's SPAE determination, the panel looked to the definitions of the three elements of a SPAE. Id. at 418, 153 A.3d 959 (citing N.J.S.A. 26:2H-12.25(a) ; N.J.A.C. 8:43E-10.3 ). The panel said that a proper finding of a SPAE requires: (1) an adverse event, or "a negative consequence of care that results in unintended injury or illness"; (2) a serious event, or one that results in "death or loss of a body part, or disability or loss of bodily function lasting more than seven days or still present at the time of discharge"; and (3) a preventable event, meaning one that "could have been anticipated and prepared against, but occurs because of an error or other system failure." Id. at 413, 153 A.3d 959 (quoting N.J.S.A. 26:2H-12.25(a) and later citing N.J.A.C. 8:43E-10.3 ).
The panel assumed for the sake of analysis that an adverse, serious event took place. Id. at 418-19, 153 A.3d 959. However, *426 the **237 panel stated that the third PSA requirement -- a preventable event -- is a causation element, namely that "the event must occur because of the error or system failure." Id. at 418, 153 A.3d 959 (internal quotation marks omitted). Relying on Kelly v. Berlin, 300 N.J. Super. 256, 268, 692 A.2d 552 (App. Div. 1997), the panel concluded that "an expert opinion was essential" in order to demonstrate that plaintiff's assumed serious adverse event occurred because of an error in her care. Id. at 419, 153 A.3d 959. Because "the trial court [did] not rely on an expert opinion to conclude that Brugaletta's serious adverse event occurred because of" an error in her care, the panel declared the trial court's SPAE finding to be unsupported by the record. Ibid. (internal quotation marks omitted).
We granted plaintiff's motion for leave to appeal pursuant to Rule 2:2-2(b). 233 N.J. 354, 185 A.3d 861 (2017). We also granted amicus curiae status to the New Jersey Association for Justice (NJAJ), the American Medical Association and Medical Society of New Jersey (collectively, AMA), and the New Jersey Hospital Association (NJHA).
II.
A.
Plaintiff maintains that the PSA's procedural requirements for investigating whether a SPAE occurred and the requirements to disclose a SPAE are distinct. According to plaintiff, the disclosure requirements rely on a hospital's subjective determination as to whether a SPAE has occurred. Plaintiff asserts that, because the PSA conferred on patients the right to know about SPAEs that occur during their treatment or care, judicial review of SPAE determinations must logically follow, otherwise, the PSA could become a method of information suppression by hospitals seeking to avoid disclosure of SPAEs. Thus, plaintiff argues that judicial review is necessary to enforce and protect the patient's right to know, as well as to avoid a patient suffering irreparable harm.
**238 Plaintiff urges adoption of the trial court's standard because it balances "the competing policy interests set forth in the PSA: the hospital's interests in confidential self-critical analysis and the goal of system-wide reporting and patient notification" of SPAEs.
Plaintiff maintains that the Appellate Division's contrasting approach places an insurmountable burden on plaintiffs seeking to enforce their right to know under the PSA by requiring a court to rely on an expert opinion on causation when, in fact, the relevant regulations create a presumption of causation. Moreover, plaintiff contends that it is more practical to place the burden on the hospital to disprove causation. That is because (1) plaintiffs are not likely to know the factual circumstances underlying a SPAE because the records are unobtainable; and (2) it is the hospital asserting the privilege and, therefore, the hospital should bear the cost and burden of disproving causation.
B.
Defendants argue that the right to know, which plaintiff insists was created in the PSA, does not exist and, to the extent that it does, it is not the primary focus of the statute or its implementing regulations.
According to defendants, the PSA was enacted to foster confidential reporting of self-critical analyses in order to make patient environments safer. In that vein, defendants note that the PSA mandates that hospitals must meet several obligations, including creation of a patient safety committee, compliance with investigative procedures, and reporting to the DOH and *427 SPAE-affected patients. To incentivize compliance, the PSA also created an absolute privilege for material produced pursuant to the PSA's procedural requirements and within the scope of the statute, which privilege is not reliant on whether a hospital correctly determines that a SPAE has occurred or on a patient's need for information. Defendants point to the statute's language to argue that the Legislature did not provide for judicial review of SPAE determinations and that the self-critical-analysis privilege does not **239 rely on whether a hospital fails to find a SPAE and report it to the DOH and the patient. Defendants assert that such review is inconsistent with the statute's express goals.
Further, defendants claim that plaintiff misstates the panel's holding in asserting that the Appellate Division placed an insurmountable burden on her by requiring an expert opinion to demonstrate causation. Rather, according to defendants, the panel merely held that the record did not support a finding of a SPAE and rejected plaintiff's argument that the PSA's implementing regulations created a presumption of causation.
Finally, defendants emphasize that the information underlying what the trial court found to be a SPAE is already available to plaintiff: defendants have turned over non-privileged discovery in the form of plaintiff's hospital chart, which contains the factual material underlying what the trial court determined was a SPAE.
C.
Supporting plaintiff, amicus NJAJ argues that a hospital should not be permitted to use its compliance with the PSA's procedural requirements as a means to circumvent the PSA's disclosure requirement. According to the NJAJ, the PSA did not abrogate preexisting law: like prior law, the PSA does not cloak facts related to a patient's treatment in privilege merely because they were discovered pursuant to a mandatory investigation. Further, the NJAJ asserts that the Appellate Division erred by failing to analyze CMH's claim of privilege consistent with Christy v. Salem, 366 N.J. Super. 535, 841 A.2d 937 (App. Div. 2004). The NJAJ argues that Christy requires a court to "balance a 'plaintiff's right to discover information concerning his care and treatment' ... against the 'public interest to improve the quality of care and help to ensure that inappropriate procedures ... are not used on future patients' " when a privilege is claimed. (quoting 366 N.J. Super. at 541, 841 A.2d 937 ). Finally, the NJAJ urges this Court to allow courts to perform in camera reviews of hospitals' SPAE determinations and, if the reviewing court finds that a SPAE
**240 occurred, to permit that court to release any factual matter relating to the SPAE to the plaintiff and report the SPAE to the DOH.
D.
Supporting defendants' position, amici AMA and NJHA argue against a judicially crafted exception to the self-critical-analysis privilege that relies on a court's review of a SPAE determination or a hospital's compliance with the PSA's reporting requirements. According to those amici, the self-critical-analysis privilege is contingent only on compliance with the PSA's procedural requirements, which, if met, shield the analysis and its resulting reports.
The NJHA emphasizes that the court's role in reviewing PSA-related issues is limited to ruling on discovery challenges and that the PSA does not provide for judicial review of a hospital's overall compliance with the statute. That role, according to the NJHA, is filled by the DOH. Further, the NJHA argues requiring a hospital to turn over all of the factual materials underlying *428 a SPAE, as well as the fact that a SPAE occurred, would result in providing patients with more information than the PSA requires. The NJHA points to PSA language that a hospital need advise a patient only that a SPAE has, or likely has, occurred.
III.
We turn first to the claim that the trial court erred as a matter of law, misconstruing its role when interacting with the PSA process and the scope of the self-critical-analysis privilege. Generally, we accord substantial deference to a trial court's disposition of a discovery dispute. See Capital Health Sys., Inc. v. Horizon Healthcare Servs., Inc., 230 N.J. 73, 79-80, 165 A.3d 729 (2017). We will not ordinarily reverse a trial court's disposition of a discovery dispute "absent an abuse of discretion or a judge's misunderstanding or misapplication of the law." Ibid. To the extent that our review involves questions of statutory interpretation, **241 however, our review is de novo. Verry v. Franklin Fire Dist. No. 1, 230 N.J. 285, 294, 166 A.3d 1140 (2017).
A.
The statute that created the self-critical-analysis privilege is central in the parties' arguments. The PSA was already examined in C.A. ex rel. Applegrad v. Bentolila, 219 N.J. 449, 99 A.3d 317 (2014), a case in which we had our first opportunity to consider the applicability of the privilege and did so by setting forth the basic structure of the statute.[6] For our present analysis, we summarize the core features of the PSA and its implementing regulations.
The PSA was legislatively designed to minimize adverse events caused by patient-safety system failures in a hospital or other health care facility. N.J.S.A. 26:2H-12.24(b) and (c). As noted in C.A., through that multi-faceted statutory scheme, the Legislature sought to encourage self-critical analysis related to adverse events and near misses by fostering a non-punitive, confidential environment in which health care facilities can review internal practices and policies and report problems without fear of recrimination while simultaneously being held accountable. 219 N.J. at 464, 99 A.3d 317 ; see also N.J.S.A. 26:2H-12.24(e).
The PSA requires health care facilities to formulate processes wherein patient safety committees comprised of members with "appropriate competencies" can perform self-critical analyses on SPAEs and near-miss incidents, formulate evidence-based plans for increasing patient safety, and provide for on-going personnel **242 training related to patient safety. N.J.S.A. 26:2H-12.25(b) ; N.J.A.C. 8:43E-10.4 and - 10.5(a). Thus, reported SPAEs receive intense review through the patient safety committee's process of self-critical analysis. See N.J.A.C. 8:43E-10.4(b)(3).
The PSA and its implementing regulations define a SPAE as "an adverse event that is a preventable event and results in death or loss of a body part, or disability or loss of bodily function lasting more than seven days or still present at the time of discharge from a health care facility." N.J.S.A. 26:2H-12.25(a) ;
*429 N.J.A.C. 8:43E-10.3. An adverse event is one "that is a negative consequence of care that results in unintended injury or illness, which may or may not have been preventable," and a preventable event is "an event that could have been anticipated and prepared against, but occurs because of an error or other system failure." N.J.S.A. 26:2H-12.25(a) ; N.J.A.C. 8:43E-10.3.
When a health care facility or an employee thereof suspects that a SPAE may have occurred, the facility's patient safety committee, required by N.J.S.A. 26:2H-12.25(b) and N.J.A.C. 8:43E-10.4, must have in place a process for employees to alert the committee to that fact. N.J.A.C. 8:43E-10.5(a)(1). Then the patient safety committee must do two things: (1) perform a "root cause analysis" to identify the causes of a SPAE and appropriate corrective action, N.J.A.C. 8:43E-10.3 and - 10.4(d)(7) ; and (2) report the SPAE to the DOH and to the affected patient.
Regarding the latter, the patient safety committee must report all SPAEs to the DOH, N.J.S.A. 26:2H-12.25(c), within five business days of the event's discovery, N.J.A.C. 8:43E-10.6(b). The report to the DOH must include, among other things, how the event was discovered, the nature of the event, and what corrective actions were taken. N.J.A.C. 8:43E-10.6(c). A failure to report a SPAE to the DOH can subject a facility to civil monetary fines. See N.J.A.C. 8:43E-3.4(a)(14). The health care facility also must alert the affected patient to the SPAE, N.J.S.A. 26:2H-12.25(d) ; N.J.A.C. 8:43E-10.7(a)(1), and generally must do so within twenty-four hours of the event's discovery, N.J.A.C. 8:43E-10.7(b).
**243 Notably, the PSA confers a privilege on a facility's self-critical analysis and the reporting of a SPAE to the DOH. See C.A., 219 N.J. at 467, 99 A.3d 317. The PSA bars discovery of "[a]ny documents, materials, or information received by the [DOH]" in the context of reporting a SPAE. N.J.S.A. 26:2H-12.25(f)(1) ; N.J.A.C. 8:43E-10.9(a)(1).
Similarly, regarding information developed as part of the process of self-critical analysis, the PSA provides that
[a]ny documents, materials, or information developed by a health care facility as part of a process of self-critical analysis conducted pursuant to subsection b. of this section [ (codified as N.J.S.A. 26:2H-12.25(b) ) ] concerning preventable events, near-misses and adverse events, including serious preventable adverse events, and any document or oral statement that constitutes the disclosure provided to a patient or the patient's family member or guardian pursuant to subsection d. of this section [ (codified as N.J.S.A. 26:2H-12.25(d) ) ], shall not be: subject to discovery or admissible as evidence or otherwise disclosed in any civil, criminal, or administrative action or proceeding.
[ N.J.S.A. 26:2H-12.25(g)(1).]
Regulations promulgated to clarify the PSA's self-critical-analysis privilege delineated in section 12.25(g) specify that the documents, materials, or information must have been developed "exclusively during the process of self-critical analysis" performed pursuant to N.J.A.C. 8:43E-10.4, - 10.5, or - 10.6. N.J.A.C. 8:43E-10.9(b) ; accord C.A., 219 N.J. at 467-68, 99 A.3d 317 (discussing exclusivity requirement of N.J.A.C. 8:43E-10.9(b)(1) ). As stated in C.A.,
pursuant to N.J.A.C. 8:43E-10.9, ... the statutory privilege applies only to documents, materials and information developed exclusively during self-critical analysis conducted during one of three specific processes: the operations of the patient or resident safety committee *430 pursuant to N.J.A.C. 8:43E-10.4, the components of a patient or resident safety plan as prescribed by N.J.A.C. 8:43E-10.5, or reporting to regulators under N.J.A.C. 8:43E-10.6. In the regulations that became effective in 2008, the statutory standard was expanded upon in two significant respects: first, to require that the documents, materials and information at issue be "exclusively" prepared in the setting of a qualifying self-critical analysis process, and second, to mandate that the self-critical analysis be conducted in accordance with one of three accompanying regulations as a prerequisite for the privilege to attach, N.J.A.C. 8:43E-10.4, - 10.5 and - 10.6.
[ 219 N.J. at 468, 99 A.3d 317 (citations omitted).]
Although not presented in the facts of C.A., we dismissed, in dicta, an argument that a finding that an event is not reportable **244 should abrogate the self-critical-analysis privilege. Id. at 471 n.14, 99 A.3d 317. We commented that nothing in the language of the PSA "limits the privilege to settings in which the incident [being investigated] is ultimately determined to be subject to mandatory reporting" to the DOH, and, therefore, the self-critical-analysis privilege "is not constrained to cases in which the deliberative process concludes with a determination that the case is reportable." Ibid. We added the comment to underscore our perception, at the time, that the goal of fostering facilities' and health care professionals' trust in the secrecy of a privileged process -- so needed for the PSA process to work -- implicitly resulted in privileged protection no matter the ultimate outcome of the review process.
Importantly, the privileges provided in the PSA do not bar the discovery or admission into evidence of information that would otherwise be discoverable or admissible. Even though particular information, materials, or documents may have been developed in the process either of self-critical analysis or reporting a SPAE to the DOH, such material may nevertheless be discoverable and admissible if it is obtainable from any other source or in "any ... context other than those specified" in the PSA. N.J.S.A. 26:2H-12.25(h).
Relatedly, the PSA provides that its provisions do not change the discoverability of information or documents obtained from other sources, or in other contexts, as provided in the Appellate Division's opinion in Christy, issued prior to the PSA's enactment. N.J.S.A. 26:2H-12.25(k) ; Christy, 366 N.J. Super. at 544-45, 841 A.2d 937 (holding, contrary to hospital's claim of privilege, that plaintiff was entitled to "purely factual" content from hospital's peer-review report but not to deliberative material).[7] The Legislature's **245 express acknowledgment of that decision, as well as its nod to documents obtained through sources other than the PSA's process of self-critical analysis, leaves no doubt of that Branch's respect for the importance of discovery in ensuring the fair resolution of litigation brought before courts.
B.
Initially, we note that the trial court was well within proper judicial bounds when examining the facts underlying the claim of privilege in this case. When a requesting party demands information or documents over which the *431 opposing party claims a privilege, the responding party may withhold that information or document as long as it expressly asserts the claimed privilege and details the nature of the information withheld. R. 4:10-2(e)(1) (providing for withholding of requested privileged information); R. 4:17-1(b)(3) (providing that party need not reveal privileged information in response to interrogatory as long as privilege is invoked according to Rule 4:10-2(e)(1) ). When a requesting party challenges an assertion of privilege, the court must undertake an in camera review of the purportedly privileged document or information and make specific rulings as to the applicability of the claimed privilege. See Seacoast Builders Corp. v. Rutgers, 358 N.J. Super. 524, 542, 818 A.2d 455 (App. Div. 2003) (discussing basic pre-trial discovery principles).
Here, defendants invoked the PSA's self-critical-analysis privilege relating to DCP-2. In order to assess the basis for the privilege, it was incumbent on the trial court to review, in camera, whether the privilege was properly invoked and whether the statutory privilege did, in fact, bar the information plaintiff sought. See ibid. It was what came next that is problematic.
The claim of privilege asserted here alerted the trial court to a set of facts underlying CMH's self-critical analysis. Based on those **246 facts, the trial court determined that plaintiff was subjected to a SPAE and that the hospital erred in concluding otherwise. From that conclusion, the court determined that CMH was required to turn over a redacted DCP-2 and report the event to the DOH because the PSA required reporting of SPAEs to both the DOH and the patient. Although the trial court correctly determined that it could review in camera the facts underlying what the hospital concluded was not a SPAE, we hold that the court exceeded its authority, first in declaring that a SPAE had occurred and then in issuing its related orders that CMH disclose to plaintiff a redacted version of DCP-2 and report the event to the DOH.
1.
The Legislature inserted no role for a trial court to play in reviewing the SPAE determination made by a patient safety committee of a health care facility. By contrast, the PSA provides a regulatory oversight role for the DOH. The Legislature vested enforcement of the PSA in the hands of the Commissioner of Health. N.J.S.A. 26:2H-12.25(j) (vesting power in Commissioner of Health to "adopt such rules and regulations necessary to carry out the provisions of [the PSA]"); see also N.J.A.C. 8:43E-3.4(a)(14) (providing for civil monetary penalties for health care facilities failing to disclose SPAEs to DOH). No corresponding role is explicit or implicit in the PSA with regard to a court called upon to resolve a discovery dispute over a privileged document. We decline to entangle the courts in an essentially administrative function.
Accordingly, we need express no opinion on what standard should govern the determination of whether a SPAE occurred or the related issues of causation and expert testimony. To the extent that the Appellate Division refined and reversed[8] the trial court's effort to establish a proper review standard for identifying an **247 event under review as a SPAE, we vacate the Appellate Division's analysis. *432 2.
Although we conclude that the trial court erred in passing judgment as to CMH's SPAE determination, we nevertheless consider the discovery remedy it imposed for its finding, namely the disclosure of the redacted report.
The language and structure of the PSA leave no reasonable doubt about the legislative intent regarding the self-critical-analysis privilege it authorizes. See DiProspero v. Penn, 183 N.J. 477, 492-93, 874 A.2d 1039 (2005) (noting that statutory-interpretation analysis begins with plain language of statute and that, where language of statute is unambiguous, analysis can come to end). The pertinent provisions of N.J.S.A. 26:2H-12.25 evidence an intent to encase the entire self-critical-analysis process in a privilege, shielding a health care facility's deliberations and determinations from discovery or admission into evidence.
As the Appellate Division properly held, the only precondition to application of the PSA's privilege is whether the hospital performed its self-critical analysis in procedural compliance with N.J.S.A. 26:2H-12.25(b) and its implementing regulations. Brugaletta, 448 N.J. Super. at 414-15, 153 A.3d 959. N.J.S.A. 26:2H-12.25(g), which creates the privilege, does not condition the privilege on the finding of a SPAE. The subsection provides no such limiting basis for its invocation. By subsection (g)'s very terms, the privilege it announces encompasses "[a]ny documents, materials, or information developed by a health care facility as part of [its] process of self-critical analysis" under subsection (b). Thus, the Legislature's protective privilege around the process of performing a self-critical analysis is broad, provided procedural compliance is present. The privilege otherwise unconditionally protects the process of self-critical analysis, the analysis's results, and the resulting reports developed by a facility in its compliance with the PSA.
**248 Our construction of the pertinent language is congruent with the stated legislative findings and declarations, which evince a clear purpose to establish a safe, non-punitive environment within which concerns might be brought forth, examined, and used for improvements in patient safety. See N.J.S.A. 26:2H-12.24(e) and (f). To construe the statute otherwise -- by making its protective privilege dependent on a SPAE finding -- would be at cross-purposes with the patent legislative desire to encourage trust and reporting by health care facilities and their employees whenever a concern about a near miss or adverse event comes to light. Our construction gives effect to all words of the statute. See McCann v. Clerk of Jersey City, 167 N.J. 311, 321, 771 A.2d 1123 (2001) ("It is a cardinal rule of statutory construction that full effect should be given, if possible, to every word of a statute. We cannot assume that the Legislature used meaningless language." (quoting Gabin v. Skyline Cabana Club, 54 N.J. 550, 555, 258 A.2d 6 (1969) ) ). And, it avoids reaching a result that thwarts the patent overall legislative design. See Murray v. Plainfield Rescue Squad, 210 N.J. 581, 592, 46 A.3d 1262 (2012) (reaffirming that objective of statutory interpretation is to effectuate legislative intent).
Accordingly, as intimated through dictum in C.A., we now hold that the finding that an event is not reportable does not abrogate the self-critical-analysis privilege.
Because the PSA shields the process of self-critical analysis, beginning to end, including its outcome, the happenstance that a reviewing court becomes convinced that an erroneous conclusion was reached as to *433 whether a SPAE occurred is of no consequence to the privilege determination. Application of the privilege to the documents developed through self-critical analysis, regardless of the conclusion reached, is an integral part of the legislative scheme on which courts should be wary to transgress. See C.A., 219 N.J. at 473, 99 A.3d 317 (noting privilege's essential role in promoting "thorough and candid discussions of events occurring in health care facilities"). **249 In sum, we are compelled to conclude the PSA was misapplied and the trial court's discretion abused when it declared that a SPAE occurred and ordered CMH to release a redacted form of DCP-2 to plaintiff and report the event to the DOH. See Capital Health Sys., 230 N.J. at 79-80, 165 A.3d 729. A court may not order the release of documents prepared during the process of self-critical analysis.
IV.
Although a court may not order release in discovery of a report developed during self-critical analysis, even if redacted, and although a court may not determine whether it agrees with the health care facility's conclusion as to whether an adverse event constitutes a SPAE and, based on that determination, order disclosure to the DOH, the court's role in resolving this discovery dispute is far from over.
A.
Generally, a party "may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action." R. 4:10-2(a); see also In re Liquidation of Integrity Ins. Co., 165 N.J. 75, 82, 754 A.2d 1177 (2000) ("Generally, ... parties may obtain discovery regarding any non-privileged matter that is relevant to the subject of a pending action or is reasonably calculated to lead to the discovery of admissible evidence."). Discovery is available through, among other approved means, written interrogatories. R. 4:10-1. We liberally construe our discovery rules "because we adhere to the belief that justice is more likely to be achieved when there has been full disclosure and all parties are conversant with all available facts." Integrity Ins. Co., 165 N.J. at 82, 754 A.2d 1177.
When a requesting party demands access to or copies of papers in an interrogatory, the responding party may decline by stating with specificity the reason for its noncompliance in response to the interrogatory. R. 4:17-5(b). When a responding party declines to turn over requested documents, the requesting party may file a **250 motion to compel discovery, R. 4:23-5(c), after having made a good-faith attempt to meet and confer with the responding party or having notified the responding party that continued noncompliance with the discovery request will lead to a motion to compel, R. 1:6-2(c).
In such circumstances, the court has the obligation to resolve the discovery dispute.
B.
As we stressed earlier, the PSA did not abrogate existing health care law and does not immunize from discovery information that would be otherwise discoverable. N.J.S.A. 26:2H-12.25(h) ("Notwithstanding the fact that documents, materials, or information may have been considered in the process of self-critical analysis ..., the provisions of this act shall not be construed to increase or decrease, in any way, the availability, discoverability, admissibility, or use of any such documents, materials, or information if obtained from any source or context other than those specified in this act."); N.J.A.C. 8:43E-10.9(e) (noting that PSA implementing regulations *434 "shall not be construed to increase or decrease, in any way, the availability, discoverability, admissibility or use of any documents, materials or information otherwise available from other sources merely because the documents, materials or information were presented during proceedings of the patient or resident safety committee").
Part and parcel of defendants' argument was the assertion that, although they did not directly disclose the events underlying the trial court's SPAE determination to plaintiff, they did turn over in discovery plaintiff's non-privileged medical records, which contain documents detailing the events underlying the patient safety committee's, and the trial court's, SPAE assessments. Indeed, the record before us discloses that among the thousands-of-pages-long patient records, there are notations across several pages that, when read together, reveal the nature of the events underlying the divergent SPAE determinations of the committee and the trial court. Those notations are in plaintiff's medical **251 records pursuant to health care law requirements concerning patient recordkeeping. See N.J.A.C. 8:43G-15.2(e) (mandating inclusion in medical records of "[a]ny adverse incident"[9] ); N.J.S.A. 26:2H-12.8 (providing non-exhaustive list of patient rights including, under subsection (c), patient's right "[t]o obtain from the physician complete, current information concerning his diagnosis, treatment, and prognosis in terms he can reasonably be expected to understand"); N.J.A.C. 8:43G-4.1 (implementing N.J.S.A. 26:2H-12.8 and expanding list of patient rights); N.J.A.C. 8:43G-4.1(a)(24) and (25) (establishing patient's right "[t]o have prompt access to the information contained in the patient's medical record," and "[t]o obtain a copy of the patient's medical record").
Here, based on a review of the record before us, including defendants' confidential appendix, it is apparent that plaintiff was subjected to an adverse incident, per N.J.A.C. 8:43G-15.2(e). Although they did not use the term "adverse incident," that much is discernible from the information that plaintiff's doctors and CMH placed in her patient records. That raw factual information was documented in plaintiff's patient records well before the process of self-critical analysis was commenced in her instance, which resulted in the report over which the parties clashed as a principle of privilege.
Although, as we have held, DCP-2 is not subject to disclosure in discovery, even in redacted form, defendants rightly did not object **252 to release of the raw underlying factual data and did, in fact, produce that material. But, it is buried within mounds of plaintiff's patient records. Specificity as to where to find that information is lacking. Yet, when called on to defend against the release of privileged information, defendants provided the court a concise step-by-step narrative, walking the court through *435 the relevant excerpts of plaintiff's patient records, to demonstrate that defendants had provided plaintiff with the underlying non-privileged facts about her care that sufficiently addressed the information requested in interrogatory number five and that could be disclosed without piercing the PSA privilege.
The trial court redacted DCP-2 in its effort to effectuate the release of purely factual information while simultaneously protecting deliberative material related to CMH's self-critical analysis. The court's purpose -- to achieve a fair resolution to a difficult discovery issue -- was proper. However, the court should not have used a self-critical-analysis document to achieve its goal.
Instead, the trial court should have used its common law power, in administering the discovery rules, to order defendants to provide plaintiff a narrative similar in form to the one they presented the court. That court-ordered remedy would have allowed the court to balance the litigation interests of the parties, to avoid transgressing the privilege and the salutary purposes it is intended to achieve, and to keep the courts out of a regulatory scheme in which we have no role vis-à-vis declarations of SPAEs. Plaintiff was unquestionably entitled to the raw data contained in her patient records. And mandating a narrative to steer her to that information would have required defendants to identify, as they should have, an adverse incident to plaintiff, see N.J.A.C. 8:43G-15.2(e), in language she could understand, see N.J.S.A. 26:2H-12.8(c).
C.
The Court Rules provide that an evasive or incomplete answer given in response to a discovery request, such as an interrogatory, **253 is treated as a failure to answer. R. 4:23-1(b). Where an interrogatory requests information that can be derived from documents to which the requesting party has access, it may be a sufficient answer to that interrogatory to point specifically to documents from which the requesting party can derive a response in keeping with Rule 4:17-4(d). That rule provides that
it is a sufficient answer to such interrogatory to specify the records from which the answer may be derived or ascertained and to afford to the party serving the interrogatory reasonable opportunity to examine, audit or inspect such records and to make copies, compilations, abstracts or summaries. A specification shall be in sufficient detail to permit the interrogating party to locate and to identify, as readily as can the party served, the records from which the answer may be ascertained.
[R. 4:17-4(d).]
Importantly, the rule states that a specification is warranted when "the burden of deriving or ascertaining the answer is substantially the same for the party serving the interrogatory as for the party served." Ibid.
Rule 4:17-4(d), adopted in 1972, "is taken from Federal Rule of Civil Procedure 33(c).[10 ]" John H. Klock, 1B N.J. Practice: Court Rules Ann. cmt. 5 to R. 4:17-4 (6th ed. 2010). The Federal Rule, the language of which was substantially adopted in our Rule,[11] provides that
*436 [i]f the answer to an interrogatory may be determined by examining, auditing, compiling, abstracting, or summarizing a party's business records (including electronically stored information), and if the burden of deriving or ascertaining the answer will be substantially the same for either party, the responding party may answer by:
(1) specifying the records that must be reviewed, in sufficient detail to enable the interrogating party to locate and identify them as readily as the responding party could; and **254 (2) giving the interrogating party a reasonable opportunity to examine and audit the records and to make copies, compilations, abstracts, or summaries.
[ Fed. R. Civ. P. 33(d).]
Federal Rule 33(d) is normally discussed in the context of a party's invocation of the rule in response to an interrogatory and a subsequent challenge to the sufficiency of that response by the requesting party through a motion to compel discovery. See, e.g., United States ex rel. Landis v. Tailwind Sports Corp., 317 F.R.D. 592, 594 (D.D.C. 2016) (noting that matter appeared before court in context of challenge to invocation of option to produce business records); S.E.C. v. Elfindepan, 206 F.R.D. 574, 576 (M.D.N.C. 2002) ("The [c]ourt normally first becomes involved when a party files a motion to compel."). By contrast, the parties here have not invoked our analogue to that rule, Rule 4:17-4(d); instead, the records have been presented as a matter of course, and the issue is whether the presentation is sufficiently specific. Nevertheless, because our Rule 4:17-4(d) is derived from Federal Rule of Civil Procedure 33(d), "it is appropriate to look to federal decisions for guidance" in interpretation of the rule. See, e.g., Adler v. Shelton, 343 N.J. Super. 511, 523-26, 778 A.2d 1181 (Law Div. 2001) (interpreting Rule 4:10-2(d) by reference to federal cases discussing Federal Rule of Civil Procedure 26 ).
Generally, the federal option to provide business records has been understood to prohibit responding parties from using the option to refer to business records as a way to burden a requesting party. See 7 James W. Moore et al., Moore's Federal Practice § 33.105(1) (3d ed. 1997).[12] According to the Advisory Committee on the 1970 Amendments to the Federal Rules,
**255 [t]he interrogating party is protected against abusive use of this provision through the requirement that the burden of ascertaining the answer be substantially the same for both sides. A respondent may not impose on an interrogating party a mass of records as to which research is feasible only for one familiar with the records.
[ Fed. R. Civ. P. 33 advisory committee's note to 1970 amendment.]
When assessing the relative burdensomeness of a request that the responding party provide some narrative answer versus the burdensomeness of requiring the requesting party to peruse documents to ferret out the answer, courts have looked *437 to whether the documents were "voluminous or incapable of being deciphered" by the requesting party. See Sadofsky v. Fiesta Prods., LLC, 252 F.R.D. 143, 148 (E.D.N.Y. 2008). Thus, where records are "well-organized, clear and straightforward," a court usually will find that the burden on the requesting party is equal to that of the responding party and, therefore, permit a responding party to answer an interrogatory by mere reference to business records. See id. at 148-49. But more, in the form of specification, explanation, or narrative, may be required.
The United States Court of Appeals for the Third Circuit, applying the federal analogue to our rule, found in Al Barnett & Son, Inc. v. Outboard Marine Corp. that invocation of the option to refer to business records in response to an interrogatory placed a heavier burden on the requesting party where "each [responding] party served with interrogatories was more familiar with his bookkeeping methods and records than was the [requesting party]." 611 F.2d 32, 35 (3d Cir. 1979). In that matter, the defendant served interrogatories requesting financial information relating to the plaintiff's antitrust damages and the responding party attempted to invoke Federal Rule 33's option to produce business records. Id. at 34. The court there found that because "[m]any of the records were handwritten, and apparently difficult to read," and the responding parties were more familiar with the records, it was more burdensome on the requesting party to derive the **256 requested information from the documents than it was for the responding party to extract that same information and provide it to the requesting party. Id. at 35. Thus, in that case, the responding party was ordered to provide an accompanying narrative response. Id. at 34-35 ; see also Sabel v. Mead Johnson & Co., 110 F.R.D. 553, 554, 556-57 (D. Mass. 1986) (ordering responding party to provide narrative answer in response to interrogatory where, initially, responding party merely pointed to 154,000-page document).
Although no similar reported case law exists in New Jersey, our trial courts have the authority under Rule 4:17-4(d) to compel a party producing documentary records to provide, with the records, a narrative that specifies for the requesting party where responsive information may be found. We do not mean to suggest that such a narrative is to be routinely provided in discovery, but it is within the range of court-ordered remedies that may be required to resolve a discovery dispute. Under the circumstances presented in this appeal, where a patient suffered an incident adverse to her interests and identifying features of that incident are memorialized in her patient chart, the privileged nature of one document created during the process of self-critical analysis does not prevent a more fulsome answer to interrogatory number five. Although the patient chart entries relate to a later and otherwise privileged process under the PSA, the underlying data is not privileged. Notwithstanding that this setting is different from most in which an order compelling a narrative usually arises, as noted above, we highlight this power of the courts under the Court Rules as a means for balancing the litigation interests in this matter, promoting a fair trial, and securing the public policies inherent in the maintenance of a strong self-critical-analysis privilege under the PSA.
Plaintiff was entitled to be informed of an adverse incident related to her care in defendants' response to discovery demands because such an incident was memorialized through various entries in her patient records. Yet, she was not informed of it and, **257 notwithstanding her fifth interrogatory, received no specification or narrative to *438 accompany the approximately 4500 pages of medical records turned over during discovery that would lead her to the discrete yet interconnected notations of the incident that appear on nine pages of that record. As explained earlier, see supra at 252-53, 190 A.3d at 434-35, in these circumstances, we hold that the trial court should, on remand, order a narrative to accompany the documents already turned over to plaintiff in order to satisfy defendants' obligation to provide a complete response to interrogatory number five.[13]
V.
We affirm in part and reverse in part the Appellate Division judgment, and we remand for proceedings in accordance with this opinion. We do not retain jurisdiction.
CHIEF JUSTICE RABNER and JUSTICES PATTERSON, FERNANDEZ-VINA, SOLOMON, and TIMPONE join in JUSTICE LaVECCHIA's opinion. JUSTICE ALBIN filed a dissenting opinion.

Although some record documents spell plaintiff's name as "Janelle," we herein adopt the spelling used in the documents submitted on plaintiff's behalf.

"Necrotizing fasciitis is a bacterial infection of the tissue under the skin that surrounds muscles, nerves, fat, and blood vessels.... Once in the body, the bacteria spread quickly and destroy the tissue they infect." Ctrs. for Disease Control & Prevention, Acting Fast is Key with Necrotizing Fasciitis, https://www.cdc.gov/features/necrotizingfasciitis/index.html (last updated July 9, 2018).

The report, designated Incident Report 005, appears related to a complaint plaintiff had regarding the CMH staff and is not a subject of this appeal.

DCP-1 is not a subject of this appeal.

We will return to the definition of and requirements attendant upon SPAEs later in the opinion. For now, it suffices to note that health care facilities have certain reporting obligations with respect to SPAEs under the PSA. We focus here on the trial court's conclusions based on its determination that plaintiff suffered a SPAE that the CMH failed to report.

In that discussion, we noted that although the PSA was enacted in 2004, its implementing regulations were not effective until March 2008, C.A., 219 N.J. at 462, 467, 99 A.3d 317, which was roughly nine months after the document at issue was prepared, id. at 455, 99 A.3d 317. We concluded that the hospital in that matter should not be penalized with disclosure of its deliberative material because it did not adhere to strict rule requirements about internal committee operation during self-critical analysis when those rule requirements had not yet been made known. Id. at 473, 99 A.3d 317. The present matter arose after the regulatory structure was in full effect.

In Christy, an Appellate Division panel balanced the "plaintiff's right to discover information concerning his care and treatment" against the "public interest to improve the quality of care and help to ensure that inappropriate procedures, if found, are not used on future patients." 366 N.J. Super. at 541, 841 A.2d 937.

The Appellate Division applied a causality analysis, which it determined had not been met due to the absence of any expert analysis in the record before the trial court. Brugaletta, 448 N.J. Super. at 418-19, 153 A.3d 959.

"Adverse incident" is a differently worded term than "adverse event," utilized and defined in the PSA and its implementing regulations. See N.J.S.A. 26:2H-12.25(a) ; N.J.A.C. 8:43E-10.3. The regulations do not define what constitutes an adverse incident. Norms of statutory construction dictate that we look to the ordinary usage of a phrase's constituent words. See DiProspero, 183 N.J. at 492, 874 A.2d 1039 (noting, in statutory-construction context, that "[w]e ascribe to the statutory words their ordinary meaning and significance"); see also U.S. Bank, N.A. v. Hough, 210 N.J. 187, 199, 42 A.3d 870 (2012) ("We interpret a regulation in the same manner that we would interpret a statute."). We accordingly find that "adverse" is generally understood to mean "in opposition to one's interests: detrimental, unfavorable," Webster's New Int'l Dictionary 31 (3d ed. 1981), and "incident" means "an occurrence of an action or situation felt as a separate unit of experience," id. at 1142.

The federal option to produce business records, from which Rule 4:17-4(d) is derived, was renumbered and is now found at Fed. R. Civ. P. 33(d).

Notably, New Jersey is not the only state to substantially adopt the text of Federal Rule of Civil Procedure 33(d) into its Court Rules. See, e.g., Ala. R. Civ. P. 33(c) ; Del. Super. Ct. Civ. R. 33(d) ; Mass. R. Civ. P. 33(c) ; Pa. R. Civ. P. 4006(b) ; Tex. R. Civ. P. 197.2(c).

Generally, when determining whether a response utilizing documents under Federal Rule 33(d) is sufficient, courts consider the following: (1) whether the documents to which the responding party points contain the information sought in the interrogatory; (2) whether the responding party has pointed with sufficient specificity to the documents containing the information sought in the interrogatory; and (3) whether the burden on the responding party to produce a narrative response is the same as the burden on the requesting party to look to the referenced documents and derive the requested information therefrom. Sadofsky v. Fiesta Prods., LLC, 252 F.R.D. 143, 147 (E.D.N.Y. 2008).

In this matter, we resolve the instant discovery dispute as it arose. Our dissenting colleague makes broader pronouncements about the Patient Bill of Rights that are not material to the outcome of this case. We do not do so, and we disagree with the dissent's attempt to cast our opinion in such a light.