SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court and may not summarize all portions of the opinion.

**Madeline Keyworth v. CareOne at Madison Avenue (A-17/18-23) (088410)**

**Argued May 2, 2024 -- Decided August 5, 2024**

**PIERRE-LOUIS, J., writing for the Court.**

In this consolidated appeal, the Court considers whether internal reports and documents created after alleged adverse events occurred at the defendant nursing and assisted living facilities are discoverable or are instead privileged under the New Jersey Patient Safety Act (PSA), N.J.S.A. 26:2H-12.23 to -12.25.

In the first appeal, Keyworth v. CareOne at Madison Avenue, plaintiff Madeline Keyworth claims that she sustained injuries from two falls at a skilled nursing facility and seeks the facility's internal incident reports and associated documents relating to those falls. In the second appeal, Bender v. Harmony Village at CareOne Paramus, plaintiffs Suzanne and Jonathan Bender, as co-executors of decedent Diane Bender's estate, seek an incident report and associated documents regarding an alleged attack committed against decedent by another resident during her stay at an assisted living facility. In both appeals, the defendant institutions and caregivers asserted that the requested materials are not discoverable pursuant to the PSA's self-critical-analysis privilege, which shields certain internal communications from discovery in litigation. See N.J.S.A. 26:2H-12.25(b), (c), (f), (g).

The trial courts in both matters found that the self-critical-analysis privilege did not apply and ordered defendants to disclose the materials. The Appellate Division reversed, concluding that defendants procedurally complied with the PSA and that the documents at issue are therefore privileged. 476 N.J. Super. 86, 107-09 (App. Div. 2023). The Court granted leave to appeal. 256 N.J. 126 (2024).

**HELD:** The only precondition to applying "the PSA's privilege is whether the hospital performed its self-critical analysis in procedural compliance with N.J.S.A. 26:2H-12.25(b) and its implementing regulations." Brugaletta v. Garcia, 234 N.J. 225, 247 (2018). One of those regulations requires that a facility's patient safety committee operate independently from any other committee within the facility. See N.J.A.C. 8:43E-10.4(c)(4). The facilities in these consolidated appeals did not comply with that procedural requirement, and the disputed documents are therefore not privileged.

1

1. Enacted in 2004, the PSA and its implementing regulations set out a detailed procedural plan to minimize adverse events caused by patient-safety system failures in a hospital or other health care facility. N.J.S.A. 26:2H-12.24(b) and (c). Through the PSA's multi-faceted framework, the Legislature aimed to encourage self-critical analysis related to adverse events and near misses by fostering a non-punitive, confidential environment in which health care facilities can review internal practices and policies and report problems without fear of recrimination while simultaneously being held accountable. The statute requires facilities to "develop and implement a patient safety plan for the purpose of improving the health and safety of patients at the facility" and sets minimum requirements for those plans, including the creation of "a patient safety committee, as prescribed by regulation." N.J.S.A. 26:2H-12.25(b). The PSA's corresponding regulations outline the requirements for a patient safety committee in significant detail. Relevant here, the regulation directs that the "patient or resident safety committee shall not constitute a subcommittee of any other committee within a facility or health care system." N.J.A.C. 8:43E-10.4(c)(4). That exclusivity requirement is significant because other statutes, both federal and state, impose additional requirements on health care facilities including nursing homes. (pp. 6-9)

2. Normally, parties may "obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action." R. 4:10-2(a). The PSA, however, confers an absolute privilege on documents, materials, and information developed as part of a health care facility's self-critical analysis. See N.J.S.A. 26:2H-12.25(g)(1). But investigations that are undertaken pursuant to other laws are not shielded by the PSA privilege, and the PSA does not affect the discoverability of material that "may have been considered in the process of self-critical analysis . . . if obtained from any source or context other than those specified in [the PSA]." See N.J.S.A. 26:2H-12.25(h). (pp. 28-30)

3. The Court reviews in detail Brugaletta, in which it recently addressed the PSA's self-critical-analysis privilege. 234 N.J. at 241-45. There, the plaintiff sued her treating physicians and the hospital for medical malpractice. Id. at 232. During pre-trial discovery, the plaintiff issued an interrogatory seeking "statement[s] regarding this lawsuit" and identifying information about the individuals involved. Id. at 233. In its decision, the Court noted that "[t]he Legislature inserted no role for a trial court to play in reviewing the" substance of the patient safety committee's determination about an adverse event in determining whether related documents were privileged. Id. at 246. Rather, "the only precondition to application of the PSA's privilege is whether the hospital performed its self-critical analysis in procedural compliance with N.J.S.A. 26:2H-12.25(b) and its implementing regulations." Id. at 247. Interpreting N.J.S.A. 26:2H-12.25(b) and (g)'s plain language, the Court concluded that "the PSA leave[s] no reasonable doubt about the

legislative intent regarding the self-critical-analysis privilege it authorizes." Ibid. That intent "encase[s] the entire self-critical-analysis process in a privilege, shielding a health care facility's deliberations and determinations from discovery or admission into evidence." Ibid. In sum, Brugaletta establishes procedural compliance with the PSA's requirements as the single metric for evaluating a health care facility's invocation of the PSA privilege. (pp. 31-34)

4. One of the PSA's implementing regulations expressly provides that the patient safety committee "shall not constitute a subcommittee of any other committee within a facility or health care system." N.J.A.C. 8:43E-10.4(c)(4). That regulation mandates that the patient safety committee act independently of other committees. Here, defendants' certifications demonstrate that the evaluative processes within their facilities did not adhere to the PSA's procedural scheme because they were created for the dual purpose of complying with federal and state law. Therefore, defendants' own admissions that they treated their committees related to quality assurance and improvement as patient safety committees to comply with both the requirements of the PSA and their federal obligations shows that they did not follow "the only precondition to application of the PSA's privilege." Brugaletta, 234 N.J. at 247. Moreover, the institutions' investigations were not undertaken "exclusively during the process of self-critical analysis in accordance with N.J.A.C. 8:43E-10.4, 10.5 or 10.6" as mandated by another implementing regulation. See N.J.A.C. 8:43E-10.9(b). Accordingly, the incident reports and associated documents at issue are not privileged and thus subject to discovery. (pp. 35-37)

5. The Court recognizes the important competing interests involved between patients and their right to know what occurred, and health care facilities and their interest in ensuring effective self-critical analysis to promote optimal patient-safety practices. The PSA acknowledges it will unlikely be the case that everything is privileged, which is consistent with the competing interests involved. (pp. 37-39)

**REVERSED. REMANDED to the trial court.**

**CHIEF JUSTICE RABNER and JUSTICES PATTERSON, SOLOMON, WAINER APTER, FASCIALE, and NORIEGA join in JUSTICE PIERRE-LOUIS's opinion.**

3

SUPREME COURT OF NEW JERSEY
A-17/18 September Term 2023
088410

Madeline Keyworth,

Plaintiff-Appellant,

v.

CareOne at Madison Avenue,
Ann Duran, RN, and Donald Gelin, LPN,

Defendants-Respondents,

and

Dalia Tadros, MD,

Defendant.

Suzanne Bender and Jonathan Bender,
Co-Executors for the Estate of
Diane Bender, and on behalf of the
heirs of Diane Bender,

Plaintiffs-Appellants,

v.

Harmony Village at CareOne
Paramus, Olga Romaine, RN,
Risa Kory, RN, Gelacio Ramirez, RN,
and Cecilia Ugwu, RN,

Defendants-Respondents.

1

On appeal from the Superior Court,
Appellate Division, whose opinion is reported at
476 N.J. Super. 86 (App. Div. 2023).

Argued          Decided
May 2, 2024      August 5, 2024

E. Drew Britcher argued the cause for appellants
(Britcher, Leone & Sergio, attorneys; E. Drew Britcher,
of counsel and on the briefs, and Jessica E. Choper, on
the briefs).

Anthony Cocca argued the cause for respondents (Cocca
& Cutinello, attorneys; Anthony Cocca and Katelyn E.
Cutinello, of counsel and on the briefs).

Jonathan F. Lauri argued the cause for amicus curiae
New Jersey Association for Justice (Stark & Stark,
attorneys; Jonathan F. Lauri, of counsel and on the brief,
and Denise Mariani, on the brief).

Ross A. Lewin argued the cause for amicus curiae New
Jersey Hospital Association (Faegre Drinker Biddle &
Reath, attorneys; Ross A. Lewin, of counsel and on the
brief).

Ryan A. Notarangelo submitted a brief on behalf of
amicus curiae New Jersey Defense Association (Dughi,
Hewit & Domalewski, attorneys; Ryan A. Notarangelo
and Herbert Kruttschnitt, III, of counsel and on the brief).

Michael A. Moroney submitted a brief on behalf of amici
curiae Medical Society of New Jersey and American
Medical Association (Flynn Watts, attorneys; Michael A.
Moroney, of counsel, and Catherine J. Flynn, on the
brief).

In this consolidated appeal, we consider whether incident reports and associated documents at issue are privileged under the New Jersey Patient Safety Act (PSA), N.J.S.A. 26:2H-12.23 to -12.25.

In 2004, the Legislature enacted the PSA to minimize medical errors that could harm patients in hospitals and other health care facilities. The law imposed new obligations on those facilities for assessing and reporting adverse events and near-misses, and it created an absolute privilege -- the self-critical-analysis privilege -- to shield certain internal communications from discovery in litigation. N.J.S.A. 26:2H-12.25(b), (c), (f), (g). In enacting the PSA, the Legislature aimed to encourage health care workers to openly disclose their observations and concerns and to facilitate professional and administrative staff's self-critical evaluation. At the same time, however, the statute did not impact a plaintiff's ability to discover factual information regarding alleged adverse events through other non-privileged means.

The matters before us involve the discoverability of disputed internal documents created after alleged adverse events occurred at facilities subject to the PSA's procedural requirements.

In the first appeal, Keyworth v. CareOne at Madison Avenue, plaintiff Madeline Keyworth claims that she sustained injuries from two falls at a skilled nursing facility and seeks the facility's internal incident reports and associated documents relating to those falls. During pre-trial discovery, the CareOne defendants[1] refused to produce those materials, asserting that they are not discoverable pursuant to the PSA's self-critical-analysis privilege.

In the second appeal, Bender v. Harmony Village at CareOne Paramus, plaintiffs Suzanne and Jonathan Bender (the Benders), as co-executors of decedent Diane Bender's estate, seek an incident report and associated documents regarding an alleged attack committed against decedent by another resident during her stay at an assisted living facility. Like the defendants in Keyworth, the Harmony Village defendants[2] claimed that those materials are privileged under the PSA and refused to disclose them during pre-trial discovery.

---

[1] The named defendants in the first matter are CareOne at Madison Avenue, LLC d/b/a CareOne at Madison Avenue; Ann Duran, RN; Donald Gelin, LPN; and Dalia Tadros, MD. We collectively refer to all defendants as CareOne.

[2] The named defendants in the second matter are Harmony Village at CareOne Paramus; Olga Romaine, RN; Risa Kory, RN; Gelacio Ramirez, RN; and Cecelia Ugwu, RN. We collectively refer to all defendants as Harmony Village.

After reviewing the disputed documents in camera, the trial courts in both matters found that the self-critical-analysis privilege did not apply and ordered defendants to disclose the materials.  Defendants sought leave to appeal, to seal portions of the records, and to stay the trial court proceedings.  Harmony Village also moved to consolidate their cases.  The Appellate Division granted all of those motions.  In a published opinion, the appellate court reversed the trial courts' orders in both matters, concluding that defendants procedurally complied with the PSA and that the documents at issue are therefore privileged and not discoverable.  Keyworth v. CareOne at Madison Ave., 476 N.J. Super. 86, 107-09 (App. Div. 2023).

We granted plaintiffs' motion for leave to appeal and now reverse.  The facilities in these consolidated appeals did not comply with the procedural requirements of the PSA, and, therefore, the disputed documents are not privileged under that statute.  Defendants' certifications, which avow that their quality assurance and improvement committees also operated as patient safety committees to comply with the PSA, defeat their claims for the self-critical-analysis privilege.  In order to invoke the privilege, the PSA and its implementing regulations require that a facility's patient safety committee operate independently from any other committee within the facility.  See N.J.A.C. 8:43E-10.4(c)(4).

5

As we noted in Brugaletta v. Garcia, the only precondition to applying "the PSA's privilege is whether the hospital performed its self-critical analysis in procedural compliance with N.J.S.A. 26:2H-12.25(b) and its implementing regulations." 234 N.J. 225, 247 (2018). Because that did not occur in either case, we reverse the Appellate Division's judgment and remand to the trial courts for further proceedings consistent with this opinion.

I.

Before turning to the facts of these appeals, we provide the following summary of the requirements for patient-safety review processes at hospitals and other health care facilities.

Enacted in 2004, the PSA and its implementing regulations set out a detailed procedural plan to minimize adverse events caused by patient-safety system failures in a hospital or other health care facility. N.J.S.A. 26:2H-12.24(b) and (c). Through the PSA's multi-faceted framework, the Legislature aimed to "encourage self-critical analysis related to adverse events and near misses by fostering a non-punitive, confidential environment in which health care facilities can review internal practices and policies and report problems without fear of recrimination while simultaneously being held accountable." Brugaletta, 234 N.J. at 241; see N.J.S.A. 26:2H-12.24(e).

6

Then-New Jersey Department of Health (DOH) Commissioner Clifton R. Lacy, MD, echoed this intent in his testimony before the Senate Health, Human Services and Senior Citizens Committee, stating that the PSA "strikes the right balance between acknowledging and learning from errors, and also holding people accountable. It shields self-critical analysis from discovery, but maintains discoverable all that is now discoverable." Hearing on S. 557 Before the S. Health, Hum. Servs. & Senior Citizens Comm., 211th Leg. 6 (2004) (statement of Clifton R. Lacy, MD).

Although the Legislature did not intend for the PSA to replace preexisting evaluative processes in the health care setting, C.A. ex rel. Applegrad v. Bentolila, 219 N.J. 449, 461 (2014), the statute requires facilities to "develop and implement a patient safety plan for the purpose of improving the health and safety of patients at the facility," N.J.S.A. 26:2H-12.25(b); see N.J.A.C. 8:43E-10.4(a). At a minimum, patient safety plans must include:

> (1) a patient safety committee, as prescribed by regulation;
>
> (2) a process for teams of facility staff, which teams are comprised of personnel who are representative of the facility's various disciplines and have appropriate competencies, to conduct ongoing analysis and application of evidence-based patient safety practices in order to reduce the probability of adverse events resulting from exposure to the health care system across a range of diseases and procedures;

7

(3) a process for teams of facility staff, which teams are comprised of personnel who are representative of the facility's various disciplines and have appropriate competencies, to conduct analyses of near-misses, with particular attention to serious preventable adverse events and adverse events; and

(4) a process for the provision of ongoing patient safety training for facility personnel.

[N.J.S.A. 26:2H-12.25(b).]

The statute immediately adds: "The provisions of this subsection shall not be construed to eliminate or lessen a hospital's[3] obligation under current law or regulation to have a continuous quality improvement program."  Ibid.

The PSA's corresponding regulations outline the requirements for a patient safety committee in significant detail, including, for example, direction as to how to appoint the chairperson and members; meeting frequency; documentation; regular review protocols; and data analysis of the committee's findings.  See N.J.A.C. 8:43E-10.4(c) and (d).  Relevant here, the regulation directs that the "patient or resident safety committee shall not constitute a subcommittee of any other committee within a facility or health care system." N.J.A.C. 8:43E-10.4(c)(4) (emphasis added); see C.A., 219 N.J. at 462 ("The

---

[3]  Although the statute uses the term "hospital," N.J.A.C. 8:43E-10.5(b)(1) specifies that this requirement applies to any "facility" that is required to "implement and maintain a continuous quality improvement program" under Title 8.

8

regulation mandates that the patient safety committee . . . act independently of other committees.").

That exclusivity requirement is significant because other statutes, both federal and state, impose additional requirements on health care facilities including nursing homes. Nursing homes, for example, must comply with the Federal Nursing Home Reform Act (FNHRA), 42 U.S.C. §§ 1396r(b)(1)(B), 1395i-3(b)(1)(B), which requires nursing homes to maintain a Quality Assessment and Assurance Committee (QAAC). And federal regulations require health care facilities to maintain a Quality Assurance and Performance Improvement (QAPI) program that focuses on "indicators of the outcomes of care and quality of life," 42 C.F.R. § 483.75(a), and set forth an identical structure and purpose for the facility's QAAC to those found in the FNHRA, see 42 C.F.R. § 483.75(g)(2)(i) to (ii). New Jersey separately requires assisted living facilities to have Quality Improvement (QI) programs under N.J.A.C. 8:36-21.1, including written plans for resident care and ongoing monitoring of resident services.

## II.

This appeal involves two separate cases consolidated by the Appellate Division. Because this matter involves confidential records and comes before us on interlocutory appeal from the trial courts' discovery rulings, we briefly

9

recite each case's alleged facts and relevant procedural history, but make no factual findings.

## A. Keyworth v. CareOne at Madison Avenue

Plaintiff Madeline Keyworth was an eighty-year-old patient at skilled nursing facility CareOne at Madison Avenue (CareOne) from November 16 to 18, 2016. Keyworth alleges that on November 18, 2016, she suffered two falls -- the first at approximately 12:45 a.m. in her room, and the second later that morning in front of the nurses' station. Her treating nurses documented the events surrounding both falls in her medical chart.[4] Regarding the first fall, an entry in Keyworth's chart at 3:27 a.m. reported that

> at 1245am was call[ed] by aid to room that they noted [patient] stumbling against closet door to floor. [Patient] noted on the floor sit[t]ing . . . . When asked what happen[ed], [patient] stated she woke up and came [out] of bed to[o] fast and was mildly disoriented and wasn't aware of the room, while walk[ing] around in the room . . . grab[bed] on to roommate[']s [wheelchair] and [wheelchair] was locked and stumbles along the closet door with [wheelchair] hit her right shoulder.

At 5:21 p.m., another chart entry reported that Keyworth had fallen earlier and complained of "pain to hip and pelvis, [right] shoulder and

---

[4]  Keyworth's medical chart, however, does not appear to contain all facts relevant to her two falls; it does not state, for example, who witnessed the incidents; whether Keyworth's roommate provided any factual statements; whether Keyworth's bed had side rails; or whether staff were at the nurses' station when Keyworth's second fall occurred.

humerus." Regarding the second fall, the entry continued that later the same morning, while "sitting in front of nursing station . . . for closer observation, resident attempted to stand and slid to floor, seen and examine[d] by 8am." The entry concluded by noting that "pain management was in progress" and "bed and chair alarm in place, call light within [reach]."

Keyworth alleges that she fractured her right hip as a result of the falls. CareOne did not report the falls to the DOH, but it developed two internal incident reports, one shortly after each fall. The information contained in those incident reports is in CareOne's confidential appendix, which Keyworth has not seen, and we do not disclose those facts here.

On November 16, 2018, Keyworth filed an eight-count complaint against CareOne, alleging common law negligence, breach of contract, and violations of several statutes. Keyworth propounded Form C interrogatories, to which CareOne responded on April 16, 2020, producing several requested documents, including Keyworth's medical chart during her residency at defendants' facility.

Interrogatory five asked CareOne to state

> (a) the name and address of any person who has made a statement regarding this lawsuit;
>
> (b) whether the statement was oral or in writing;
>
> (c) the date the statement was made;

11

(d) the name and address of the person to whom the statement was made;

(e) the name and address of each person present when the statement was made; and

(f) [t]he name and address of each person who has knowledge of the statement.

CareOne did not substantively respond to inquiries (a) through (f). Instead, CareOne objected, asserting in relevant part that the request "seeks information that is protected by . . . the [PSA's] privilege of self-critical analysis." CareOne maintained that "[t]hose documents, and the information contained therein, are strictly confidential, and may not be disclosed or distributed to any person or entity outside of the review process, except as otherwise provided by law." CareOne confirmed that it possessed two incident reports dated November 18, 2016, listing them in an attached privilege log, but refused to produce them.

Between October 2020 and September 2021, Keyworth's counsel deposed three of CareOne's nurses, but all three testified that they could not independently recall any details about Keyworth or the alleged falls beyond the minimal information they documented in her medical chart. For example, the nurses testified that they could not state with certainty whether they witnessed Keyworth's alleged falls or whether they were on the premises when

12

the falls occurred; whether the side rails on Keyworth's bed were raised at the time of the falls; or whether the attending nurses discussed the falls afterwards.

On March 31, 2022, after deposing the parties and fact witnesses and exchanging expert reports, Keyworth moved to compel production of the incident reports for in camera review and all factual information contained therein. Keyworth argued that she could not obtain certain factual data that may exist only in the reports because her medical chart lacked key information and "the defendants and fact witnesses largely lack any recollection of the events of this case and have relied upon the records and their habits and practices to provide testimony concerning relevant facts."

CareOne cross-moved for a protective order, arguing that the reports were not discoverable under the PSA's self-critical-analysis privilege. CareOne submitted a certification by Michael Shipley, licensed nursing home administrator and chair of the facility's QAAC, asserting that the QAAC created the incident reports and associated documents "for the sole purpose" of complying with the PSA and 42 C.F.R. § 483.75, a federal regulation that governs federal QAPI plans. Shipley stated that CareOne's "QAPI plan comports with the requirements of N.J.S.A. 26:2H-12.25(b)," because, among other things, CareOne has a "Quality Assessment and Assurance Committee or 'QAAC,' which performs the functions of a Resident Safety Committee."

13

The trial court ordered CareOne to provide the incident reports and associated documents to the court for in camera review to resolve the privilege dispute. On June 22, 2022, after reviewing the materials in camera, the court issued an order along with a brief statement of reasons, finding the documents were "not privileged" because they "were directly related and relevant to the matter at issue."

### B. Bender v. Harmony Village at CareOne Paramus

On September 4, 2018, then eighty-three-year-old decedent Diane Bender was admitted to Harmony Village at CareOne Paramus (Harmony Village), a memory care assisted living facility housing patients with dementia and other conditions. Her estate's co-executors, the Benders, allege that on June 8, 2019, another resident "attacked" Bender in her room. As a result of the attack, Bender allegedly suffered multiple rib fractures, head trauma, spinal contusion, and pneumothorax.

Bender's medical chart includes entries at 1:31 p.m. and 2:44 p.m. on the day of the alleged attack.[5] According to the entries, she called for help around 12:00 p.m., at which point a nurse found her "sitting on the floor leaning by the head side of the bed and another resident was sitting by the foot of her

---

[5] Like Keyworth's medical chart, Bender's chart provides few details surrounding the alleged incident.

14

bed." The entries also noted that Bender was "very anxious" and complained of "pain on her right upper back," but did not display "visible signs of pain" other than a small bruise on her abdomen.

The chart also indicated that Bender herself called 9-1-1 because she was in pain and did not believe the staff was helping her. According to the police report created on the day of the alleged incident, when officers arrived on scene, defendant Risa Kory, R.N., told them that Bender did not need their assistance. Later, Bender's medical team determined that she needed to be seen at the hospital, and she was admitted at around 5:43 p.m. the same day. Bender eventually returned to Harmony Village and died five weeks later.

Harmony Village created an incident report related to the alleged attack on June 9. The "Investigation Report" is addressed to the "QAA Committee," or QAAC, from Kory, in her capacity as chair of the facility's QAPI Committee. The incident summary within the report states that a nurse found Bender on the floor towards the head of her bed with "[the other resident] sitting calmly on the foot of her bed," and Bender claiming that "[h]e pushed me," which the other resident denied. According to the report, the other resident "is known to walk into open doors, but [there was] no prior concern" about his behavior.

15

The report includes a "Summary of Critical Information Obtained During Investigation," which discusses Bender's and the other resident's histories while residents at the assisted living facility. According to the summary, Bender "ha[d] a history of long standing psychiatric diagnoses including anxiety," and "ha[d] a history prior to admission of agitation and verbal aggression towards others which has lessened over her stay at Harmony [Village]." The summary described the other resident as an eighty-seven-year-old man with dementia whose "behavioral patterns include repeatedly walking around the neighborhood[,] . . . history of mild irritable mood, and impaired judgment. When an apartment door is open, he has been observed entering apartments believing it is his. When asked, he will leave apartments of other residents without difficulty." The report concluded that "there was no apparent/witnessed resident to resident incident. [The other resident] entered [Bender's] apartment and at some point she fell, it is not clear how . . . . Both residents will have service care plans reviewed and revised upon their return to the community."

The report also identified three staff members whom Kory interviewed about the alleged attack within two days of the incident. Kiswaan Smith reported "hear[ing] screams from [Bender's] room" around 12:30 p.m., and that when he entered the room, Bender was lying on the floor and said to him,

16

"that man pushed me down and my back and shoulder are broken." Maxine Morgan reported that following the incident, she was asked to "keep a close eye" on the other resident, after which he told her to "leave me alone get the f\*\*\* away from [m]e." She added that as she continued to walk with him, he "was somewhat resisting [her] verbal redirection, and grabbed [her] neck." The final witness statement from Gillacio Ramirez restated the information in Bender's medical chart.

The materials also contain a standardized "Incident/Accident Report," reporting the same information in Bender's medical chart and observing that she had no apparent injury. Kory reported the incident by telephone to the DOH on June 9, and faxed the report and associated documents to the agency in the following days.

On February 11, 2021, the Benders filed a complaint against Harmony Village, alleging the same eight counts as did the plaintiff in <u>Keyworth</u>, as well as a ninth count for Bender's severe pain and suffering. The Benders also issued the same Form C interrogatories as in <u>Keyworth</u> and received a nearly identical response from Harmony Village to interrogatory number five. Harmony Village did not identify the individuals involved and asserted the self-critical-analysis privilege over the June 8, 2019 incident report.

17

Additionally, Harmony Village asserted the "federal quality assurance privilege" pursuant to 42 U.S.C. §§ 1396r, 1395i-3, and 42 C.F.R. § 483.75.

Harmony Village objected on the same grounds to supplemental interrogatory number four, which asked "whether a resident with the first name of . . . was present on the floor where [Bender] resided at Care One Harmony Village at Paramus and, specifically, whether such person was involved with an unwanted touching or assault of [Bender] on or about June 8, 2019." Harmony Village did not substantively respond to the question but provided over five hundred pages of Bender's medical records.

The Benders scheduled depositions of the defendant nurses for November and December 2021, but those were adjourned until after defense counsel deposed the Benders. Thereafter, the Benders moved to compel production of the following, among other things: (1) the incident report and associated documents; (2) Harmony Village's response to supplemental interrogatory number four; (3) the other resident's full name and last known address; and (4) the depositions of all defendants within thirty days of the court's ruling.

Harmony Village filed a cross-motion for a protective order, attaching a certification from Kory that closely mirrors Shipley's certification in Keyworth. Kory attested to being chair of the facility's QAPI committee, that

the "QAPI plan comports with the requirements of N.J.S.A. 26:2H-12.25(b)," and that Harmony Village's QAPI committee "performs the functions of a Resident Safety Committee" under the PSA. Similar to Shipley, Kory certified that the facility's QAPI committee generated the incident report "for the sole purpose of compliance with the requirements of N.J.A.C. 8:36-21 et seq. and the PSA." She affirmed that "[a]t all relevant times, Care One Harmony Village at Paramus had in place a QAPI Plan as required by N.J.S.A. 26:2H-12.25(b)." Harmony Village therefore argued that the documents were entitled to the self-critical-analysis privilege. Kory later provided a supplemental certification confirming that she reported the incident to the DOH by phone the same day it occurred and later submitted the disputed materials in writing.

The trial court, which did not hear oral argument on the competing motions, granted the Benders' proposed order requiring, among other things, that Harmony Village (1) provide the incident report for in camera review; (2) disclose the requested information about the other resident; and (3) complete defendant depositions within thirty days after the court resolved the privilege issue. The court denied Harmony Village's cross-motion. In compliance with the court's order, Harmony Village provided the documents for in camera review, disclosed the other resident's full name, and disclosed that he is deceased.

19

On August 10, 2022, after reviewing the materials in camera, the court sent a letter to the Benders' counsel, copying defense counsel, and held that the June 8 incident report was not privileged. In the letter, the trial court explained that

> [w]hile the records include an Investigation Report, the Report is only a narrative that includes witness statements of a purported altercation between two patients. Nothing concerning deviation of protocols or self critical statements are included.
>
> Thus, the information is freely discoverable. See Brugaletta v. Garcia, 234 N.J. 225 (2018). These reports are therefore not privileged pursuant to N.J.S.A. 26:2H-12.24(e) and are discoverable.

Thereafter, the Benders' counsel filed a notice on eCourts seeking to compel the deposition of the other resident's doctor during his stay at the facility, attaching the contested documents as exhibits, which the trial court had released following its letter to the parties.

Harmony Village responded that its counsel had never received the court's letter and that it was not posted on eCourts. As a result, it claimed that it did not know the court granted the Benders' motion to compel or that the disputed materials had been released, and therefore lacked an opportunity to

appeal before the Benders accessed the allegedly privileged documents.[6]

Accordingly, Harmony Village moved to immediately delete the Benders'

motion from eCourts, to return the documents at issue to them, and to destroy

any copies in the Benders' possession.

The trial court denied Harmony Village's motion, reasoning that public

policy justified disclosure of the requested information despite the traditional

physician-patient privilege.  The court also rejected Harmony Village's

HIPAA claims as moot because the other resident is deceased.

C.

CareOne and Harmony Village each moved for leave to appeal the

respective trial court rulings, to seal portions of the records, and to stay the

trial court proceedings.  Harmony Village also moved to consolidate their

cases.  The Appellate Division granted those motions.  In a published opinion,

the Appellate Division reversed the trial courts' discovery orders.  Keyworth,

476 N.J. Super. at 107-09.

The appellate court initially noted that the PSA attaches a privilege to

specific information generated by health care facilities in two distinct

---

[6]  In addition to raising the PSA's self-critical-analysis privilege, Harmony Village claimed that the released documents were protected under HIPAA, the Health Insurance Portability and Accountability Act of 1996, 42 U.S.C. §§ 1320d-1 to -9, and the associated "Privacy Rule," see 45 C.F.R. §§ 160, 162, and 164.  Those claims are not before the Court.

21

processes: (1) the reporting of adverse events to regulators and (2) the investigative process that may or may not lead to such reporting. Id. at 103.

In Keyworth, the court determined that CareOne developed the two incident reports and associated documents during a self-critical analysis process as part of a patient safety plan that complied with N.J.S.A. 26:2H-12.25(b)'s requirements but did not report them to the DOH. Id. at 107. Thus, per N.J.S.A. 26:2H-12.25(g), the appellate court held that the materials are privileged and not discoverable. Id. at 107-08. Accordingly, the Appellate Division reversed the trial court's judgment and ordered the court to issue a protective order shielding the documents from disclosure. Id. at 108.

In Bender's matter, the Appellate Division similarly concluded that Harmony Village created the June 9 incident report concerning Bender's alleged injuries as part of its self-critical analysis under the PSA. Ibid. Specifically, the court reasoned that Harmony Village prepared the documents pursuant to its QAPI plan and to comply with the PSA's requirements and N.J.A.C. 8:36-21.1. Ibid. Further, the appellate court explained that Harmony Village developed the documents' contents as part of a patient safety plan that met N.J.S.A. 26:2H-12.25(b)'s requirements and noted that they submitted the incident report to the DOH. Ibid. For those reasons, the Appellate Division held that the disputed documents are privileged under the PSA. Ibid.

22

We granted plaintiffs' motions for leave to appeal, 256 N.J. 126 (2024), and granted amicus curiae status to the New Jersey Association for Justice (NJAJ), the New Jersey Hospital Association (NJHA), the Medical Society of New Jersey and American Medical Association (collectively, MSNJ), and the New Jersey Defense Association (NJDA). We also granted defendants' cross-motions to seal the confidential appendices but denied their motions to strike certain portions of plaintiffs' appendices and references to the same in their filings.

### III.

### A.

Keyworth asks this Court to reverse the Appellate Division's decision and remand this matter to the trial court to conduct an in-camera review of the disputed materials and to compel CareOne to provide her with the factual data contained therein, or, alternatively, to identify other non-privileged sources from which she can learn those facts. She contends that the PSA protects only a health care facility's analyses and opinions related to adverse events, not the facts underlying those deliberations. Keyworth asserts that the Appellate Division's decision limits her knowledge of the alleged incidents to those minimal facts which she can glean from CareOne's evasive interrogatory responses, her medical chart, and witnesses' imperfect recollections during

23

depositions. Consequently, she claims it is "impossible" for her to know what facts CareOne concealed and how those facts impact her case.

The Benders, on behalf of decedent's estate, seek the same relief as Keyworth and echo her contentions regarding the underlying facts' discoverability. They emphasize that the factual information contained in the incident report and associated documents "is not available from any other document," including Bender's medical chart. Further, they identify specific facts that they cannot obtain without access to the confidential appendix, including the attacking resident's full name and records demonstrating his purported history of aggression, "propensity for violence," and attempts to enter other residents' rooms. The Benders contend that those underlying facts are essential to enable them to prove their case, but the Appellate Division's decision denies them access to that information.

NJAJ supports plaintiffs' positions and contends that defendants failed to procedurally comply with the PSA, thus rendering the self-critical-analysis privilege unavailable. NJAJ submits that the Appellate Division improperly conflated the federal QAPI program, 42 C.F.R. § 483.75, with a health care facility's independent requirements under the PSA, an argument with which plaintiffs agreed in later briefing. NJAJ also argues that the QAPI program affords a narrow privilege that extends only to the QAAC's internal minutes,

24

working papers, and conclusions, but not to incident reports or investigations created outside of that distinct committee.

B.

CareOne urges this Court to affirm the Appellate Division's decision, arguing that Keyworth's distinction between facts and opinions is immaterial because the PSA affords the documents an absolute privilege. CareOne further submits that Brugaletta and the PSA protect the materials from discovery for "any purpose" because they were "undoubtedly" developed as part of a self-critical analysis under N.J.S.A. 26:2H-12.25(g). CareOne relies on the certification from its QAAC's chairperson to establish that it created the documents solely to comply with the PSA and that any information contained therein is therefore absolutely privileged.

Harmony Village asks this Court to affirm the Appellate Division's decision and relies on CareOne's brief in Keyworth to the extent that it raises the same arguments. Harmony Village additionally argues that because the incident was reported to the DOH pursuant to N.J.S.A. 26:2H-12.25(c) and (e), the disputed documents are "automatically privileged under N.J.S.A. 26:2H-12.25(f)." Harmony Village also raises privilege claims over the attacking resident's identity and medical records pursuant to HIPAA, the associated

25

"Privacy Rule," and New Jersey's physician-patient privilege, codified at N.J.S.A. 2A:84A-22.1 to -22.7.

Defendants collectively argue that this Court should not consider NJAJ's arguments because they introduce new issues at a delayed time that plaintiffs have not raised throughout this litigation. On the merits, defendants repeat the language from their respective certifications and insist that they are entitled to the PSA's self-critical-analysis privilege even though their committees simultaneously fulfilled functions relating to patient safety and quality assurance.

Several amici support defendants' positions and caution that reversing the Appellate Division's decision would chill health care facilities' investigative processes and contravene legislative intent. Amici contend that our case law, as well as the PSA's plain language and legislative history, make clear that the absolute privilege extends to facts uncovered during a facility's self-critical analysis. NJDA adds that trial courts cannot balance competing interests when determining the discoverability of facts contained in purportedly PSA-protected documents because doing so would lead to inconsistent discovery rulings and frustrate the statute's legislative purpose.

26

IV.

A.

We generally review the trial court's disposition of a discovery dispute for an abuse of discretion. Brugaletta, 234 N.J. at 240. However, to the extent that the court's decision involves a question of statutory interpretation, we review the determination de novo. Id. at 240-41.

When interpreting a statute, we aim to effectuate the Legislature's intent, W.S. v. Hildreth, 252 N.J. 506, 518 (2023), which is best indicated by the statutory text, State v. Lane, 251 N.J. 84, 94 (2022). In construing statutory text, "words and phrases shall be given their generally accepted meaning, unless that meaning is inconsistent with the clear intent of the Legislature or unless the statute provides a different meaning. Words in a statute should not be read in isolation." Shelton v. Restaurant.com, Inc., 214 N.J. 419, 440 (2013).

Thus, "we read the statutes in their entirety and construe each part or section . . . in connection with every other part or section to provide a harmonious whole." C.A., 219 N.J. at 459-60 (quoting State v. Marquez, 202 N.J. 485, 499 (2010)). If the text's plain meaning is clear and unambiguous, "we 'apply the law as written.'" State v. J.V., 242 N.J. 432, 443 (2020) (quoting Murray v. Plainfield Rescue Squad, 210 N.J. 581, 592 (2012)).

27

Conversely, if the text is ambiguous, "we may turn to extrinsic evidence, including legislative history to aid our inquiry." Hildreth, 252 N.J. at 518.

B.

Normally, parties may "obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action." R. 4:10-2(a). Rule 4:17-1(a) provides that "[a]ny party may serve upon any other party written interrogatories relating to any matters which may be inquired into under Rule 4:10-2." However, "[p]rivileged information need not be disclosed provided the claim of privilege is made pursuant to Rule 4:10-2(e). Nor need information be disclosed if it is the subject of an identified protective order issued pursuant to Rule 4:10-3." R. 4:17-1(b)(3). "When a requesting party challenges an assertion of privilege, the court must undertake an in camera review of the purportedly privileged document or information and make specific rulings as to the applicability of the claimed privilege." Brugaletta, 234 N.J. at 245.

Furthermore, under Rule 4:17-4(a), a responding party must "furnish all information available to the [responding] party," and "if the source of the information is documentary," the responding party must provide "a full description including the location thereof." However, "[a] party upon whom interrogatories are served who objects to any questions propounded therein"

28

may respond accordingly, after which the requesting party may "serve a notice of motion to compel an answer to the question" within twenty days of being served with the answers. R. 4:17-5(a). Finally, an evasive or incomplete answer in response to a discovery request, including an interrogatory, is treated as a failure to answer. R. 4:23-1(b).

## C.

The PSA confers an absolute privilege on documents, materials, and information developed as part of a health care facility's self-critical analysis:

> Any documents, materials, or information developed by a health care facility <u>as part of a self-critical analysis conducted pursuant to subsection b. of this section</u> concerning preventable events, near-misses, and adverse events, including serious preventable adverse events . . . shall not be subject to discovery or admissible as evidence or otherwise disclosed in any civil, criminal, or administrative action or proceeding.
>
> [N.J.S.A. 26:2H-12.25(g)(1) (emphasis added); <u>see</u> N.J.S.A. 26:2H-12.25(b) (listing minimum requirements for patient safety plans).]

The corresponding regulation clarifies that the absolute privilege covers "[d]ocuments, materials, and information . . . developed by a health care facility <u>exclusively</u> during the process of self-critical analysis in accordance with N.J.A.C. 8:43E-10.4, 10.5 or 10.6." N.J.A.C. 8:43E-10.9(b) (emphasis added).

29

Thus, the PSA shields specific documents, materials, or information that a health care facility develops as it investigates and evaluates adverse events only during one of three specific processes: "the operations of the patient or resident safety committee pursuant to N.J.A.C. 8:43E-10.4, the components of a patient or resident safety plan as prescribed by N.J.A.C. 8:43E-10.5, or reporting to regulators under N.J.A.C. 8:43E-10.6." C.A., 219 N.J. at 468. Investigations that are undertaken pursuant to other laws are not shielded by the PSA privilege.

In addition, despite the absolute privilege afforded by the PSA to certain materials, the PSA does not affect the discoverability of material that "may have been considered in the process of self-critical analysis . . . if obtained from any source or context other than those specified in [the PSA]." N.J.S.A. 26:2H-12.25(h). Stated differently, the PSA's self-critical-analysis privilege does "not bar the discovery . . . of information that would otherwise be discoverable." Brugaletta, 234 N.J. at 244. Relatedly, the statute clarifies that it likewise does not alter the discoverability of material obtained from other sources, or in other contexts, as provided in Christy v. Salem, 366 N.J. Super.

535, 544-45 (App. Div. 2004),[7] which the Appellate Division decided before the PSA's enactment. N.J.S.A. 26:2H-12.25(k); Brugaletta, 234 N.J. at 244.

This Court most recently addressed the PSA's self-critical-analysis privilege in Brugaletta, 234 N.J. at 241-45. There, the plaintiff sued her treating physicians and the hospital for medical malpractice during her stay, alleging that they failed to administer doses of a prescribed antibiotic and to detect a second abscess in her body. Id. at 232. During pre-trial discovery, the plaintiff issued an interrogatory seeking "statement[s] regarding this lawsuit" and identifying information about the individuals involved. Id. at 233. The defendants responded that they possessed two relevant incident reports but objected to producing them under the PSA's absolute privilege, attaching a certification from a physician asserting that the reports were prepared "for the sole purpose of complying with the requirements of the PSA" and that they were forwarded only to the hospital's patient safety committee. Id. at 233-34.

---

[7] In Christy, the Appellate Division held that despite the defendant hospital's claim of privilege, the plaintiff was entitled to "purely factual" content from the hospital's peer-review report but not to deliberative material. 366 N.J. Super. at 544-45. In making this decision, the appellate court balanced the "plaintiff's right to discover information concerning his care and treatment" against the "public interest to improve the quality of care and help to ensure that inappropriate procedures, if found, are not used on future patients." Id. at 541.

31

After the plaintiff moved to compel production of the requested documents, the trial court reviewed the report[8] in camera and ordered defendants to release a redacted version "in an attempt to honor the self-critical-analysis privilege while revealing the facts of the [serious preventable adverse event (SPAE)] to [the] plaintiff." Id. at 234-35. The court also analyzed the report's contents to determine whether the plaintiff suffered SPAE. Ibid. The court determined that the defendants had to disclose the redacted document and report the SPAE to the DOH because the PSA required such reporting to both regulators and the patient. Id. at 235. Further, the court concluded that if a hospital's decision not to report was "arbitrary and capricious," it loses its self-critical-analysis privilege. Ibid.

After granting the defendants leave to appeal, the Appellate Division reversed the trial court's order, finding (1) the entire report was absolutely privileged under the PSA, (2) the trial court's SPAE finding was "unsupported by the record," and (3) the self-critical-analysis privilege does not depend on a court's SPAE finding or the hospital reporting to the DOH. Id. at 236-37. The appellate court determined that the only precondition to applying the PSA's self-critical-analysis privilege is whether the hospital performed the self-

---

[8] By the time the appeal reached this Court, only one report was at issue. Brugaletta, 234 N.J. at 234 n.4.

32

critical analysis in compliance with the PSA and its implementing regulations. Id. at 236.

After granting the plaintiff leave to appeal from the Appellate Division's decision, this Court first determined that "[t]he Legislature inserted no role for a trial court to play in reviewing the SPAE determination made by a patient safety committee," and that courts should not become "entangle[d]" in that "essentially administrative function." Id. at 246. Notably, we agreed with the appellate court that "the only precondition to application of the PSA's privilege is whether the hospital performed its self-critical analysis in procedural compliance with N.J.S.A. 26:2H-12.25(b) and its implementing regulations." Id. at 247 (emphasis added). Interpreting N.J.S.A. 26:2H-12.25(b) and (g)'s plain language, we concluded that "the PSA leave[s] no reasonable doubt about the legislative intent regarding the self-critical-analysis privilege it authorizes." Ibid. That intent "encase[s] the entire self-critical-analysis process in a privilege, shielding a health care facility's deliberations and determinations from discovery or admission into evidence." Ibid.

In Brugaletta, we made clear that the self-critical-analysis privilege is "broad, provided procedural compliance is present. The privilege otherwise unconditionally protects the process of self-critical analysis, the analysis's results, and the resulting reports developed by a facility in its compliance with

33

the PSA." Ibid. (emphasis added). We further held "the finding that an event is not reportable does not abrogate the self-critical-analysis privilege" because the privilege covers the entire decision-making process, including one that results in finding a reportable SPAE did not occur. Id. at 248. Therefore, we instructed that a trial "court may not order the release of documents prepared during the process of self-critical analysis," even if redacted. Id. at 249.

The underscored language from Brugaletta quoted above establishes procedural compliance with the PSA's requirements as the single metric for evaluating a health care facility's invocation of the PSA privilege. In the earlier case of C.A., this Court explored in detail whether the defendant hospital had complied with the procedures prescribed by the PSA at the relevant time. See 219 N.J. at 468-70. Finding that the hospital complied with the relevant statutes and regulations in place at the time, we concluded that the requested discovery was privileged. Id. at 470-72. Compliance with the then-current PSA requirements set forth in the statute itself and its implementing regulations was our sole focus in determining whether the PSA privilege applied. See id. at 468-72.

V.

Guided by those legal principles, we hold that defendants did not comply with the PSA's procedural scheme and therefore the disputed documents in these consolidated appeals are not privileged under that statute.

To be clear, as we stated in Brugaletta, the only precondition to applying "the PSA's privilege is whether the hospital performed its self-critical analysis in procedural compliance with N.J.S.A. 26:2H-12.25(b) and its implementing regulations." 234 N.J. at 247. And one of the PSA's implementing regulations expressly provides that the patient safety committee "shall not constitute a subcommittee of any other committee within a facility or health care system." N.J.A.C. 8:43E-10.4(c)(4) (emphasis added); see C.A., 219 N.J. at 462 ("The regulation mandates that the patient safety committee . . . act independently of other committees.").

Here, defendants' certifications demonstrate that the evaluative processes within their facilities did not adhere to the PSA's procedural scheme. In Keyworth, CareOne's certification asserted that the facility's QAAC created the incident reports and associated documents "for the sole purpose" of complying with the PSA and 42 C.F.R. § 483.75, which governs federal QAPI plans. Further, CareOne's QAAC chairperson attested that the facility's "QAPI plan comports with the requirements of N.J.S.A. 26:2H-12.25(b)," 

35

because, among other things, CareOne has a QAAC, "which performs the functions of a Resident Safety Committee."

Similarly, in Bender's matter, Harmony Village presented a nearly identical certification from the facility's QAPI committee chairperson, avowing that the facility's "QAPI plan comports with the requirements of N.J.S.A. 26:2H-12.25(b)," and that the QAPI committee "performs the functions of a Resident Safety Committee" under the PSA. The certification added that the facility's QAPI committee generated the June 9 incident report "for the sole purpose of compliance with the requirements of N.J.A.C. 8:36-21 et seq. and the PSA," affirming that "[a]t all relevant times, Care One Harmony Village at Paramus had in place a QAPI Plan as required by N.J.S.A. 26:2H-12.25(b)."

N.J.A.C. 8:43E-10.4(c)(4), however, explicitly requires a health care facility's patient safety committee to operate independently from any other committee within the facility. See C.A., 219 N.J. at 462. Therefore, defendants' own admissions that they treated their committees related to quality assurance and improvement as patient safety committees to comply with both the requirements of the PSA and their QAPI obligations shows that they did not follow "the only precondition to application of the PSA's privilege." Brugaletta, 234 N.J. at 247.

36

In addition, the PSA expressly provides that it "shall not be construed to eliminate or lessen a [health care facility's] obligation under current law or regulation to have a continuous quality improvement program." N.J.S.A. 26:2H-12.25(b). Here, the defendants' certifications admit that they undertook their investigations pursuant to federal laws governing QAAC and QAPI plans. They were not undertaken "<u>exclusively</u> during the process of self-critical analysis in accordance with N.J.A.C. 8:43E-10.4, 10.5 or 10.6." N.J.A.C. 8:43E-10.9(b) (emphasis added).

Accordingly, we conclude that the incident reports and associated documents at issue are not privileged and thus subject to discovery.[9]

## VI.

Although we resolve this matter on the basis of defendants' procedural non-compliance, we recognize the important competing interests involved between patients and their right to know what occurred, and health care

---

[9] We decline to overlook defendants' non-compliance with the PSA on the ground that it was first asserted by NJAJ as amicus. We find that the interests of fairness dictate that defendants not be accorded a privilege without satisfying the requirements for that privilege. See, e.g., <u>State Farm Mut. Auto. Ins. Co. v. Zurich Am. Ins. Co.</u>, 62 N.J. 155, 165 (1973) (assessing a second insurance policy when the petition for certification challenged only a judgment as to a different policy "in the interests of a fair resolution of the entire controversy"); <u>see also</u> <u>R.</u> 2:12-11 (providing that, upon a grant of certification, "the petitioner's entire case shall be before the Supreme Court for review unless the Supreme Court otherwise orders").

facilities and their interest in ensuring effective self-critical analysis to promote optimal patient-safety practices.  See Jenkins v. Rainner, 69 N.J. 50, 56 (1976) ("Our court system has long been committed to the view that essential justice is better achieved when there has been full disclosure so that the parties are conversant with all the available facts."); Hearing on S. 557 (statement of Clifton R. Lacy, MD) (testifying that the PSA "strikes the right balance between acknowledging and learning from errors, and also holding people accountable.  It shields self-critical analysis from discovery, but maintains discoverable all that is now discoverable").

Defense counsel suggested at oral argument that documents and information are privileged under the PSA when the health care facility self-declares that the sought-after information was part of the facility's self-critical analysis process, but counsel was unable to explain when the PSA process begins and who makes that determination.  The PSA's plain language, however, makes clear that it cannot be used as a shield to shut out all possible discovery.  Indeed, we do not deal here with a case in which a health care facility sought to shut down all avenues of discovery by implementing the self-critical-analysis process within moments of an adverse event.  The PSA acknowledges it will unlikely be the case that everything is privileged, which is consistent with the competing interests involved.  See Brugaletta, 234 N.J. at

38

244-45 ("The Legislature's express acknowledgment of [Christy], as well as its nod to documents obtained through sources other than the PSA's process of self-critical analysis, leaves no doubt of [the Legislature's] respect for the importance of discovery in ensuring the fair resolution of litigation brought before courts."); see also N.J.S.A. 26:2H-12.25(h) ("[I]f obtained from any source or context other than those specified in [the PSA]," the law preserves the discoverability of material that "may have been considered in the process of self-critical analysis.").

## VII.

For the foregoing reasons, we reverse the judgment of the Appellate Division and remand both matters to the trial court for further proceedings consistent with this opinion.


CHIEF JUSTICE RABNER and JUSTICES PATTERSON, SOLOMON, WAINER APTER, FASCIALE, and NORIEGA join in JUSTICE PIERRE-LOUIS's opinion.